**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
)
**CYNTHIA A. GOODHILE, as Personal**   )
**Representative of the Estate of ARNOLD**  )        **CIVIL ACTION**
**GOODHILE, and CYNTHIA GOODHILE,** )
)        **NO. 4:14-CV-40036-TSH**
**Plaintiff,**       )
)
**v.**         )
)
**ANTHONY GRIBBONS and TOWN OF**   )
**HOLDEN,**       )
)
**Defendants.**    )
_____ )

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 50), PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT (Docket No. 64), PLAINTIFF'S MOTION TO STRIKE (Docket No. 63), AND PLAINTIFF'S SUPPLEMENTAL MOTION TO STRIKE (Docket No. 71)**

**May 16, 2016**

HILLMAN, D.J.

Cynthia Goodhile brought this suit on behalf of her husband, Arnold Goodhile, who passed away approximately two months after a violent encounter with members of the Holden police department. Mr. Goodhile was seventy-six years old at the time of the incident and suffered from Alzheimer's disease. Mrs. Goodhile alleges excessive force and various common-law causes of action against the Town of Holden and Officer Anthony Gribbons (collectively, Defendants). Defendants move for summary judgment, and Mrs. Goodhile cross-moves for partial summary judgment on her negligence claim. Mrs. Goodhile also moves to strike two paragraphs from Defendants' statement of material facts, as well as a photograph attached thereto.

For the reason set forth below, Defendants' motion for summary judgment (Docket No. 50) is ***granted*** with regard to count IV, and ***denied*** with regard to counts I, II, III, and VIII.  Plaintiff's cross-motion for partial summary judgment (Docket No. 64) is ***denied***.  Plaintiff's motion to strike (Docket No. 63) is ***denied*** as to paragraph 7 of Defendants' statement of material facts, and ***granted*** as to paragraph 41.  Plaintiff's supplemental motion to strike (Docket No. 71) is ***granted***.

## Background

On July 7, 2011, at around 6:30 a.m., Cynthia Goodhile saw her seventy-six-year-old husband, Arnold Goodhile, walk by the dining room of their house, dressed and heading out the door.  Mr. Goodhile had been diagnosed with Alzheimer's disease in 2007 or 2008.  His disease was in a "slowly progressive" status, but he remained "physically able." (Docket No. 52-1 at 11.) Mrs. Goodhile followed Mr. Goodhile to the door, down the stairs toward the driveway, and asked him where he was headed.  He turned toward her but did not answer her question.  When he turned, Mrs. Goodhile saw that he was carrying a sheathed fishing knife.  Mrs. Goodhile asked him again where he was going, and again he did not respond.  He continued down the stairs to the driveway.  Mrs. Goodhile went back inside the house and called 911.  Her conversation with the dispatcher went as follows:

| | | |
|---|---|---|
| Dispatcher: | 911 This line is recorded, what's your emergency? | |
| Caller: | My name is Cyndi Goodhile, I live at --------. My husband has Alzheimer's, and um, he is a little bit out of control this morning he just walked out the house down towards Goodhile's store and he's got a like a fishing knife in his hand | |
| Dispatcher: | Ok, he's heading toward Goodhile's? | |
| Caller: | Yup, down towards the store, we live at -------- right around the corner from the store | |
| Dispatcher: | OK Cyndi, what's your phone number? | |

| | |
|---|---|
| Caller: | -------- |
| Dispatcher: | -------- |
| Caller: | Yup |
| Dispatcher: | Ok I will send an officer down and see if we can (inaudible)… OK |
| Caller: | Thank you, bye bye. |
| Dispatcher: | Bye bye. |

(Docket No. 52-2 at 2.)

The dispatcher, David Glasberg, radioed Officer Anthony Gribbons.  Glasberg did not tell Gribbons that Mr. Goodhile had Alzheimer's disease.  And, he construed Mrs. Goodhile's statement that "he is a little bit out of control this morning" to mean that he might do harm to himself.  The communication between Glasberg and Gribbons went as follows:

| | |
|---|---|
| Dispatcher: | H to 34 [Gribbons] |
| Responder: | Go ahead H |
| Dispatcher: | Ah, can you swing down to ah, from -------- and head towards Goodhile's, I have a party calling reporting her husband ah is is heading down that direction ah with a knife in his hand she is afraid he might do harm to himself, again that was ah call from -------- heading toward Goodhile's. |
| Responder: | Received, do you have a name there? |
| Dispatcher: | Ah, reporting party was Cindy, ah, actually last name Goodhile, ah, party in question is Arnold Goodhile |
| Responder: | Coming from Malden at Redgate |
| Dispatcher: | Received |
| Responder: | (Inaudible)… I'm coming from the station |

Responder:      (Inaudible)… H is he on foot or in a vehicle?

Dispatcher:     Ah, he's on foot at this time

(Docket No. 52-2 at 2-3.)

When Officer Gribbons arrived at the Goodhile's Variety Store, he saw Mr. Goodhile walking aimlessly in the empty parking lot outside the store, holding a sheathed knife.  He was wearing slippers.  Officer Gribbons exited his cruiser, drew his firearm, called Mr. Goodhile by name, and ordered him to put down the knife and get down on the ground.  In response, Mr. Goodhile began to walk toward Gribbons.  Mr. Goodhile did not drop the knife, did not say anything, and moved very slowly.  The knife had a fixed blade that was encased in a leather sheath, and Mr. Goodhile was holding the knife in front of him.  Throughout the encounter, his hands never moved on the knife.

Officer Robert Himmer and Lieutenant Christopher Carey arrived at the scene in a separate cruiser while Mr. Goodhile was facing Gribbons.  Himmer immediately exited the cruiser and drew his firearm.  He ordered Mr. Goodhile to drop the knife, calling him by name.  Mr. Goodhile turned and began walking toward Himmer.  Carey heard Gribbons call out multiple times for Mr. Goodhile to drop the knife.  Carey also ordered Mr. Goodhile to drop the knife, calling him by name.  Mr. Goodhile then started walking toward Carey, who had not drawn his firearm and was standing behind the door of his cruiser.

What happened next is disputed.  It is undisputed that, as Mr. Goodhile was walking toward Carey and Himmer, Gribbons holstered his firearm, took out his metal baton, approached Mr. Goodhile from behind, and struck him multiple times with the baton.  It is also undisputed that, after being struck, Mr. Goodhile ended up on the ground.  Gribbons testified during his deposition that he struck Mr. Goodhile twice.  First he struck him on the right arm, in an attempt

to force him to drop the knife.  After Mr. Goodhile failed to react, Gribbons struck him on his right leg, which caused him to stumble and begin to fall.

Mrs. Goodhile had left her house after making the 911 call and caught up to Mr. Goodhile in time to witness him being struck by Gribbons.  The Goodhile's Variety Store is a short walk from her residence.  According to Mrs. Goodhile's deposition testimony, Gribbons struck Mr. Goodhile three times.  The first strike was on his right calf; the second on his left calf; the third on his left elbow.  In a statement made to the police, Mrs. Goodhile also identified a fourth strike to Mr. Goodhile's hands.  After the three or four strikes, Mr. Goodhile still did not drop the knife; so, according to Mrs. Goodhile, Gribbons "took him down to the ground." (Docket No. 62-1 at 13.)

It is undisputed that the knife was sheathed throughout the encounter, and that Mr. Goodhile did not move his hands or change his grip on the knife.  According to Mrs. Goodhile, he was holding the knife in front of him with two hands, parallel to his body.  According to Gribbons and Himmer, he was holding the knife perpendicular to his body, and one end may have been pointing slightly upwards.

After Mr. Goodhile was face down on the ground, one of the officers took possession of the knife and handcuffed him.  Gribbons and Himmer brought him to the side of the building and propped him up against the wall.  According to the officers, they carried him; according to Mrs. Goodhile, they dragged him across the pavement by his right shoulder.  Gribbons searched him and noticed that he was speaking incoherently.  After Mr. Goodhile mentioned something about a gun or shooting, Gribbons searched him again, but he did not find a gun or any other weapons.

Mr. Goodhile was taken to the emergency room at UMass Memorial Hospital.  According to Mrs. Goodhile, he received stitches in his right elbow, and he had bruising on his legs and a hematoma on his right leg.  He was medically cleared at the emergency room and then brought to

the Geriatric Psychiatry Unit of Clinton Hospital, where he was admitted and remained for approximately one month, until August 9, 2011.  The notes from Clinton Hospital state that he suffered "some injury to the back of his leg and some other bruising." (Docket No. 52-10 at 2.) According to Mrs. Goodhile, the baton strikes caused large, painful welts on his legs, and the hematoma hardened and made his right leg stiff.  He was wheelchair-bound for most of his stay at Clinton Hospital and could not walk for many weeks.  Before this incident, he had been able to feed and dress himself, and, although sometimes confused, he could converse and joke with family and friends.  Afterward, he was sullen, angry, and agitated.  He became withdrawn and more confused.  Eventually, he was transferred to St. Mary's Health Center in Worcester, where he remained until he died on September 17, 2011, approximately two months after his encounter with the police.

On March 11, 2014, Mrs. Goodhile brought this suit, as personal representative of Mr. Goodhile's estate and on behalf of herself, against the Town of Holden and Gribbons.[1]  On May 21, 2014, she filed an amended complaint.  Five counts remain: negligence by the Town (count I); battery by Gribbons (count II); excessive force by Gribbons (count III); intentional infliction of emotional distress by Gribbons (count IV); and loss of consortium (count VIII). Defendants move for summary judgment on all counts.  Plaintiff cross-moves for partial summary judgment on count I.  Plaintiff also moves to strike two paragraphs of Defendants' statement of material facts, and to strike a photograph of a knife attached thereto.

---

[1] Mrs. Goodhile also named the Police Chief, George R. Sherrill, as a defendant but later voluntarily dismissed the only count against him.

**Standard of Review**

Rule 56 of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A factual dispute precludes summary judgment if it is both "genuine" and "material." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, (1986).  An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the nonmoving party. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994).  A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id.*

When considering a motion for summary judgment, the court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing v. Outback Steakhouse of Florida*, LLC, 575 F.3d 145, 153 (1st Cir. 2009).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact within the record. *Id.* at 152.  "Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial." *Id.* (quoting *Carroll v. Xerox Corp.,* 294 F.3d 231, 236 (1st Cir. 2002)).  When considering cross-motions for summary judgment, "the court must consider each motion separately" and, in turn, draw all inferences in favor of the nonmoving party. *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir. 1997).

**Discussion**

A. *Count III: Excessive Force by Gribbons*

This claim is properly analyzed under the Fourth Amendment reasonableness standard rather than the Fourteenth Amendment due process standard, because the alleged force occurred

pursuant to Gribbons's seizure of Mr. Goodhile. *See Graham v. Connor*, 490 U.S. 386, 394 (1989) (when an "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment").  The pertinent inquiry under the Fourth Amendment standard is whether the amount of force was objectively reasonable. *See id.* at 396.  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)) (citation omitted).  It is well established that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.*  "Whether the force used to effect a particular seizure is reasonable 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Jennings v. Jones*, 499 F.3d 2, 11 (1st Cir. 2007) (quoting *Graham*, 490 U.S. at 396).

Thus, the reasonableness inquiry is specific to the facts of each case. *Graham*, 490 U.S. at 396-97.  Reasonableness is determined "in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." *Jennings*, 499 F.3d at 11 (quoting *Graham*, 490 U.S. at 397).  Relevant facts include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  "Although the severity of the injury also may be considered, . . . a 'serious injury' is not a prerequisite to recovery." *Bastien v. Goddard*, 279 F.3d 10, 14 (1st Cir. 2002) (citation omitted).

Gribbons argues that his actions were reasonable under the circumstances, because Mr. Goodhile was holding a deadly weapon and was not complying with the officers' commands to drop it. Gribbons also relies on the fact that the dispatcher, Glasberg, had said that Mrs. Goodhile was afraid that Mr. Goodhile might do harm to himself. Plaintiff, on the other hand, argues that the use of force was unreasonable because Mr. Goodhile was not suspected of a crime; he made no verbal threats to the officers; he made no threatening gestures; and his hands never moved on the knife, which remained sheathed.

Plaintiff also cites to the Holden police department's use-of-force policy, which sets out five escalating levels of force that may be used depending on a suspect's level of resistance. Gribbons completed a use-of-force report after the incident, in which he indicated that he had used his hands and the baton on Mr. Goodhile for the following purposes: "effect arrest"; "handcuff/restraint"; "defend self"; "defend another"; "safety of subject"; and "move person in custody." (Docket No. 62-14 at 2.) Under the level of resistance, he checked the boxes for "Level IV – assaultive suspect – likely to cause bodily harm" and "Level V – assaultive suspect – likely to cause serious bodily injury or death." (Docket No. 62-14 at 2.) These are the two highest levels on the continuum, and the only two that warrant the use of a baton. Levels II-V are defined as follows:

Level No:                    II

Type of Suspect:       Passive Resistant Suspect

Type of Response:      Contact Controls

Level 2 is for the passive resistant suspect, who disregards the member's commands and instructions, but does not attempt to harm the member or others at the scene while doing so. The member's response is to use contact controls, which may include physically carrying the suspect, the use of pressure points and the use of escort positions.

Level No:                III

Type of Suspect:         Active Resistant Suspect

Type of Response:        Compliant Techniques

Level 3 is for the active resistant suspect, who disregards the member's commands and instructions, and while doing so, engages in any action that would harm the member, others at the scene or the suspect himself. This level of resistance would also include those suspects who are attempting to avoid apprehension by fleeing. The member's response is to use compliant techniques, which may include the use of oleoresin capsicum spray (OC), take down techniques, and restraint techniques. [ ] Said restraint techniques shall not include choke holds and/or neck restraints unless suspect has reached Level V - Assaultive Suspect, with Assaultive Behavior Likely to Cause Serious Injury or Death.


Level No:                IV

Type of Suspect:         Assaultive Suspect, with Assaultive Behavior
                         Likely to Cause Bodily Harm

Type of Response:        Defensive Tactics

Level 4 is for the assaultive suspect, whose assaultive behavior is likely to result in bodily harm to the member, to others at the scene or to the suspect himself. The member's response is to use defensive tactics, which may include the use of personal impact weapons or the baton. [ ]


Level No:                V

Type of Suspect:         Assaultive Suspect, with Assaultive Behavior
                         Likely to Cause Serious Injury or Death

Type of Response:        Deadly Force

Level 5 is for the assaultive suspect, whose assaultive behavior may cause serious bodily injury or death to the member, others at the scene or the suspect himself. The member's response is to use deadly force, which may include the use of Bean Bag Rounds, the member's service weapon, police rifles, police shotguns or any other device, tool or equipment at the member's disposal to prevent the assaultive suspect from continuing such behavior. [ ]

(Docket No. 62-12 at 4-5.)

Plaintiff asserts that Gribbons violated this policy, because Mr. Goodhile did not exhibit any assaultive behaviors. Even under level III, which would not entitle an officer to use a baton, the suspect would have to disregard the officer's commands and also "engage[] in any action that would harm the member, others at the scene or the suspect himself." (Docket No. 62-12 at 4.) Here, the only purportedly threatening behavior was Mr. Goodhile's failure to drop the knife when ordered to do so. Plaintiff contends that Gribbons checked the boxes for levels IV and V on his use-of-force report because it would have been a violation of policy to have used his baton on a suspect who posed a lesser threat. Moreover, Himmer, who was also involved in the scene, testified during his deposition that Mr. Goodhile's behavior was somewhere between levels II and III.

Plaintiff also cites to an application for Mr. Goodhile's temporary involuntary hospitalization, purportedly completed by Gribbons, in which Gribbons attributed two seemingly false statements to Mr. Goodhile. Gribbons reported that Mr. Goodhile had said that "he wished we had 'ended it and took him out'" and that "he wanted to end it." (Docket No. 62-15 at 2.) During his deposition, Gribbons did not recall that Mr. Goodhile had made those statements. He also was not sure that he had completed the application form, even though his name appeared on it. Plaintiff argues that the use-of-force form and the involuntary-hospitalization form show that Gribbons "was willing to inflate the incident reporting to avoid liability for his actions." (Docket No. 58 at 6.) Thus, Plaintiff contends that the issue of whether Gribbons acted reasonably remains in dispute and should be resolved by a jury.

Construing the facts in the light most favorable to Plaintiff, a rational jury could find that Gribbons used unreasonably excessive force against Mr. Goodhile. This stands true even with the consideration that Gribbons received inaccurate and/or incomplete information from Glasberg.

When he arrived on the scene, Gribbons purportedly did not know that Mr. Goodhile had Alzheimer's disease, and he was under the impression that Mr. Goodhile intended to harm himself. Nevertheless, Mr. Goodhile was seventy-six years old, was moving slowly, and he carried only a sheathed knife.  A jury could find that he made no threatening gestures, said no threatening words, and moved slowly toward the officers only when they called his name.  Given these facts, it would have been unreasonable for Gribbons to strike him repeatedly from behind with a metal baton. The unreasonableness is bolstered by the fact that Mr. Goodhile had not been suspected of committing any crime; he was not attempting to evade arrest by flight; and any potential threat that he posed to himself or others was lessened by the fact that he made no verbal threats and never attempted to unsheathe or brandish his knife. *See Graham,* 490 U.S. at 396.  Additionally, the use-of-force policy provides a framework within which a jury could find that Gribbons's actions exceeded what was reasonable under the circumstances. *See Raiche v. Pietroski*, 623 F.3d 30, 37 (1st Cir. 2010).

B. *Qualified Immunity*

Gribbons raises qualified immunity in a single sentence at the conclusion of his excessive-force argument: "As such, Officer Gribbons is entitled to qualified immunity in his use of force the morning of July 7, 2011 and [count III] must be dismissed against Officer Gribbons." (Docket No. 51 at 6.)  Plaintiff argues that the issue of qualified immunity should be deemed waived, because Gribbons made no arguments to support this conclusory statement.

Assuming that Gribbons has adequately raised the issue, I nevertheless find that he is not entitled to qualified immunity.  Qualified immunity protects police officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982).  The doctrine provides public officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 743 (2011).  However, "qualified immunity does not 'shield public officials who, from an objective standpoint, should have known that their conduct was unlawful.'" *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011) (quoting *Pagan v. Calderon*, 448 F.3d 16, 31 (1st Cir. 2006)).

Courts use a two-part test to determine whether qualified immunity applies: (1) whether the facts alleged by the plaintiff make out a violation of a constitutional right; and, if so (2) whether the right was clearly established at the time of the alleged violation. *MacDonald v. Town of Eastham*, 745 F.3d 8, 12 (1st Cir. 2014).  Under the second prong of the test, the analysis involves two questions: (1) whether the legal contours of the constitutional right were sufficiently clear; and (2) whether in the specific factual context of the case, the violation would have been clear to a reasonable official. *Id.* at 12.

As explained above, the facts present a colorable claim that Gribbons violated Mr. Goodhile's constitutional rights by using unreasonable force.  The issue is whether the legal contours of the right were sufficiently clear, and whether the violation would have been clear to a reasonable officer under the circumstances. *See MacDonald*, 745 F.3d at 12.   The pertinent question in this regard is whether prior existing case law or general Fourth Amendment principles gave Gribbons notice that it was unconstitutional for a police officer to repeatedly strike an unresponsive seventy-six-year-old man who was holding a sheathed knife and who had not been accused of committing a crime. *See Raiche*, 623 F.3d at 38.

The First Circuit has held that a reasonable officer who has been trained on a use-of-force continuum does not need prior case law on point to recognize that it is unconstitutional to use substantial force on an individual who does not pose a significant threat. *See id.* at 39.  Here,

13

Gribbons was operating with the benefit of a use-of-force protocol to be applied to situations involving resisting suspects. This policy provided guidance for reasonable behavior and cited to *Graham v. Connor*, 490 U.S. 386 (1989), the case in which the Supreme Court established the applicable standard for Fourth Amendment excessive force claims. According to the policy, an officer is not entitled to use a baton on a suspect unless the suspect is assaultive, meaning that the suspect is engaged in behavior that is "likely to result in bodily harm to the member, to others at the scene or to the suspect himself." (Docket No. 62-12 at 4-5.) Considering the facts as alleged by Plaintiff, Gribbons's conduct departed from this standard. Accordingly, he is not entitled to qualified immunity.

Thus, I find that Gribbons is not entitled to summary judgment on count III. Based on the record before me, a rational jury could conclude that Gribbons's conduct was objectively unreasonable under the circumstances, in violation of Mr. Goodhile's Fourth Amendment rights. A jury could further find that a sensible officer would have known that his behavior was unreasonable and in violation of applicable law.

### C.  *Count II: Battery*

"Massachusetts law allows for assault and battery claims against police officers who use excessive force in conducting an arrest." *Raiche*, 623 F.3d at 40 (citing *Powers v. Sturtevant,* 85 N.E. 84, 84 (Mass. 1908)). "However, Massachusetts law also allows an officer to use reasonable force in conducting a lawful arrest: reasonable force is a valid defense to assault and battery." *Id.* Thus, if the force is reasonable in the constitutional sense, the battery claim must fail. *See id.*

Gribbons's arguments regarding the battery claim are dependent on his excessive force arguments. He asserts that, because the force was reasonable and he is qualifiedly immune from Fourth Amendment liability, Plaintiff's battery claim must also fail. As explained above, I find

that there are genuine issues of material fact as to whether Gribbons used excessive force, and he is not entitled to immunity. Accordingly, Gribbons is not entitled to summary judgment on count II.

    D. _Count IV: Intentional Infliction of Emotional Distress_

Gribbons argues once again that his use of force was justified, and also that Plaintiff has not offered evidence that Gribbons's actions caused Mr. Goodhile's emotional distress. In response, Plaintiff asserts that the act of striking a nonthreatening man multiple times with a metal baton is outrageous. Plaintiff further argues that Mr. Goodhile suffered "catastrophic" harm as a result of Gribbons's actions. Before the incident, he was able to joke with family; he was relatively fluent in his conversations about past events; and he was a warm companion for Mrs. Goodhile. After the incident, he became withdrawn and rarely fed himself. Plaintiff has retained an expert who concluded that the incident and the subsequent hospitalization caused Mr. Goodhile's rapid deterioration and eventual death.

Under Massachusetts law, a claim for Intentional Infliction of Emotional Distress (IIED) requires proof of the following elements: (1) that the defendant "intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." _Polay v. McMahon_, 10 N.E.3d 1122, 1128 (Mass. 2014). "Liability cannot be predicated on mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities, nor even is it enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." _Id._ (quoting _Tetrault v. Mahoney, Hawkes & Goldings,_ 681 N.E.2d 1189, 1197 (Mass. 1997))

(quotation marks and citation omitted).  The conduct at issue must go "beyond all possible bounds of decency, and [be] regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Roman v. Trustees of Tufts College,* 964 N.E.2d 331, 341 (Mass. 2012)).

Construing the facts in the light most favorable to Plaintiff, it is nevertheless undisputed that Glasberg did not tell Gribbons that Mr. Goodhile had Alzheimer's disease, and that Gribbons was operating under the mistaken belief that Mr. Goodhile was likely to harm himself.  Although Gribbons's conduct was potentially unreasonable in the constitutional sense, it was not sufficiently egregious to sustain a claim for IIED.  Gribbons is entitled to summary judgment on count IV.

### E.  *Count I: Negligence by the Town*

Under the Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258, § 2, a town may be liable for the negligent acts of its employees if those acts occur in the course of their work.  Plaintiff alleges that the Town was negligent in (1) the failure of the dispatcher, Glasberg, to accurately convey to Gribbons the information that Mrs. Goodhile had given him; and (2) the failure of Gribbons to independently investigate the situation upon arriving at Mr. Goodhile's location. Plaintiff has cross-moved for summary judgment on this count.

The Town argues that both Gribbons and Glasberg acted reasonably and that Gribbons made an independent evaluation of Mr. Goodhile when he arrived on the scene, observing that Mr. Goodhile had a knife and was standing in the middle of the parking lot. The Town maintains that Mr. Goodhile "act[ed] in a way that led the officers on scene to believe he was suicidal and/or that he intended to kill himself." (Docket No. 67 at 4.)

According to Plaintiff, the undisputed facts show that Glasberg was negligent.  The 911 transcripts show that Mrs. Goodhile told Glasberg that Mr. Goodhile had Alzheimer's disease, and that Glasberg did not communicate this information to Gribbons.  Moreover, Glasberg admitted

during his deposition that he "could see where it would be" important to pass that information along to the responding officer.  Glasberg also explained that he had assumed, based on Mrs. Goodhile's statement that Mr. Goodhile was "a little bit out of control," that she was afraid that he might do harm to himself or another person. (Docket No. 62-3 at 8, 10.)  Plaintiff argues that Glasberg's false statement caused the responding officers to have a heightened concern when they responded to the dispatch call, which in turn influenced Gribbons's decision to use force.

Plaintiff further argues that the Town is not immune pursuant to Mass. Gen. Laws ch. 258, § 10(j), which provides immunity from suit "for all harmful consequences arising from [the Town's] failure to act to prevent the violent or tortious conduct of a third person, unless it 'originally caused' the 'condition or situation' that resulted in the harmful consequence." *Kent v. Com.*, 771 N.E.2d 770, 775 (Mass. 2002).  The "original cause" language has been construed "to mean an affirmative act (not a failure to act) by a public employer that creates the 'condition or situation' that results in harm inflicted by a third party." *Id.* (citing *Brum v. Dartmouth,* 704 N.E.2d 1147, 1154-55 (Mass. 1999)).  Plaintiff argues that Glasberg's statement about self-harm materially contributed to the responding officers' heightened fear for their safety, as well as Mr. Goodhile's safety, when they responded to the scene.

There is sufficient evidence in the record to show that Gribbons's actions on the scene may have been influenced by Glasberg's statement regarding Mr. Goodhile's potential for self-harm. When asked during his deposition why he drew his firearm when he arrived on the scene, Gribbons stated that this action was "[b]ased on the radio dispatch, based on my observations, and I believe there was a knife present, there was a lethal threat, and I—based on the dispatch too, I was informed he was gonna [*sic*] harm himself." (Docket No. 62-6 at 14.)  Gribbons was also asked whether there was anything—aside from the fact that Mr. Goodhile was carrying a sheathed knife and had

17

refused to follow commands to drop it—about his demeanor that made Gribbons believe that he

was a lethal threat.  Gribbons responded:

> When coupled with the dispatch that he was looking to harm
> himself, the way we're taught is that a suicidal person is homicidal
> and that you should treat somebody that's got a weapon that's—you
> known, that you have knowledge that somebody—you have some
> knowledge that the person is going to hurt themselves and that they
> could hurt others or you.

(Docket No. 62-6 at 21-22.)  When asked whether Gribbons made personal observations of suicidal

behavior, Gribbons replied: "Other than the fact he didn't—he had a weapon, we had a dispatch,

and that he didn't drop the weapon or stop moving." (Docket No. 62-6 at 22.)  When asked what

evidence he had witnessed that made him believe that Mr. Goodhile was a danger to himself,

Gribbons replied, "The radio dispatch that I heard . . . coupled with the fact that he wasn't obeying

any of our commands." (Docket No. 62-6 at 28.)

Thus, a jury could find that Glasberg was negligent in telling Gribbons that Mr. Goodhile

was a threat to himself, and failing to tell him that Mr. Goodhile had Alzheimer's disease.  The

jury could further find that Glasberg's report caused Gribbons to treat Mr. Goodhile in an overly

hostile manner.   However, construing the facts in the light most favorable to the Town, a

reasonable jury could alternatively find that Gribbons's actions would have been the same even if

he had known the truth about Mr. Goodhile's mental status and intentions, because Gribbons's

actions were based on his observations of Mr. Goodhile on the scene, as well as on the dispatch

information.  Accordingly, neither the Town nor the Plaintiff are entitled to summary judgment on

count I.

### F.  *Count VIII: Loss of Consortium*

Defendants' only argument with regard to the loss-of-consortium claim is that, because all

of the other claims should be dismissed, this claim must also fail.  As explained above, counts I,

II, and III will survive summary judgment.  Accordingly, Defendants' motion is denied as to count VIII.

G. *Plaintiff's Motions to Strike*

Plaintiff moves to strike two paragraphs from Defendants' statement of material facts, as well as a photograph of a knife.  First, Plaintiff moves to strike paragraph 7, which reads as follows: "Mr. Goodhile had not yet taken his three daily medications for Alzheimer's when he left his house." (Docket No. 52 at 2.)  Plaintiff objects to this statement on the grounds of relevance and foundation.  Second, Plaintiff moves to strike paragraph 41, which contains the conclusions of an "Investigation of the Use of Force Against Arnold Goodhile by members of the Holden Police Department," conducted by the Massachusetts State Police:

> The Massachusetts State Police, who investigated the incident, found that "these officers acted in a way that follows the procedures in place. Arnold Goodhile did have a knife in his hands. The Holden police officers do appear to have used an escalation of force from verbal commands to use of a baton to disarm Arnold Goodhile, a person armed with a knife that they thought was suicidal, Arnold Goodhile was subsequently transported by ambulance for a mental health evaluation. No criminal charges were ever sought against Arnold Goodhile."

(Docket No. 52 at 6.)  Plaintiff argues that this information is irrelevant and consists of inadmissible hearsay.  In response, Defendants argue relevance but do not offer any reasons why the statement is not inadmissible hearsay.  Third, Plaintiff moves to strike Exhibit D to Defendants' statement of material facts, which is a photograph, allegedly of the knife that Mr. Goodhile was carrying during his encounter with the police.  Plaintiff argues that the record lacks adequate foundation to show that this photograph is of the knife in question.  Defendants respond that Rule 56 does not require foundation at the summary judgment stage.

Neither of the challenged statements, nor the picture of the knife, are influential in my summary judgment decision.  Regarding admissibility, the first statement has minimal relevance but is supported by personal knowledge.  The second statement is inadmissible hearsay, and Defendants have not argued otherwise.  Exhibit D consists of multiple photographs of a knife and sheath, next to a pen—presumably for size comparison.  The only identification of these photographs appears in one paragraph of Defendants' statement of material facts: "The knife was a fixed blade in a leather sheath. (Exhibit D, Pictures of the knife)." (Docket No. 52 at 3.)  This statement is not sufficient to establish that Exhibit D depicts the knife in question.  The exhibit should have been attached to an affidavit, sworn by an individual with personal knowledge, who could identify it as a photograph of the knife that Mr. Goodhile was carrying on July 7, 2011. *See Materials Considered on the Motion—Pleadings, Depositions, Answers to Interrogatories, Admissions, Affidavits, Exhibits, and Trial Records*, 10A Fed. Prac. & Proc. Civ. § 2722 (3d ed.) ("Exhibits that have been properly made a part of an affidavit also may be considered.").

Accordingly, Plaintiff's motion to strike paragraph 7 is denied; Plaintiff's motion to strike paragraph 41 is granted; and Plaintiff's motion to strike Exhibit D is granted.

## Conclusion

For the reasons set forth above, Defendants' motion for summary judgment (Docket No. 50) is ***granted*** with regard to count IV, and ***denied*** with regard to counts I, II, III, and VIII. Judgment shall enter for Gribbons on count IV.  Plaintiff's cross-motion for partial summary judgment (Docket No. 64) is ***denied***.  Plaintiff's motion to strike (Docket No. 63) is ***denied*** as to paragraph 7 of Defendants' statement of material facts, and ***granted*** as to paragraph 41.  Plaintiff's supplemental motion to strike Exhibit D (Docket No. 71) is ***granted***.

**SO ORDERED.**

<u>*/s/ Timothy S. Hillman*</u>
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**